Mr. Dunner, are you going to distribute examples of the toys that we're going to be talking about? The last time you were on a panel with me involving a toy was Hot Wheels, and we did distribute samples. I'm surprised you remember that. I do remember that, many years ago. Well, we'll announce the case as Intervention Toys v. MGA, Wal-Mart and Toys R Us, 2014, 1731. Mr. Dunner. Good morning, and may it please the Court. The District Court committed four fundamental errors which undermined its refusal to grant chain law on obviousness. I'll just summarize them. One, the District Court ruled that Phillips, the expert for MGA, conceded that neither the laser chest nor the swift references disclosed game pieces, and therefore did not disclose a combination necessary to render the claims obvious. The District Court failed to find a motivation to combine, and not only did the District Court fail to find a motivation to combine, the District Court didn't even mention motivation to combine in its opinion. The question on JMOL of obviousness is whether the jury had substantial evidence to find the absence of a motivation to combine in the relevant ordinary skilled artisan, right?  It doesn't really matter what the District Court said in the District Court's opinion. We have a straightforward, substantial evidence question for a finding that the jury made. So why is there not substantial evidence for the finding that there would have been no motivation to combine by the relevant artisan? Because I suggest that there was no substantial evidence on the question of what a person of ordinary skill in the art was, on the question of motivation, on the question of whether there was a nexus to secondary considerations, and a key finding of the District Court and a key argument by intervention was that MGA's expert conceded that there were missing elements, and that their expert testified that there were missing elements. Those were essential to support a substantial evidence case, and I submit all of them are lacking, and let me explain why. Can you focus very specifically on the motivation to combine? Pardon? Can you focus just on the motivation to combine? I will. The motivation to combine, first of all, in the Swift reference itself, the Swift reference basically says that the invention in that case can be done physically or electronically. This court in the prior appeal said that the record contains substantial evidence that in the case of strategy games, inventors were indifferent to whether it was physical or electronic, and they did both. And I suggest that given those teachings, that to hold that there was no motivation to combine, when you've got a game, all of these games involve lasers and optics, all of them are board games involving lasers and optics. The laser chess articles were computer games. The Swift article was a physical game. I suggest that nothing could be clearer than that there was a motivation to combine. And if we even look at the KSR case, the court talks about a few options that were clear options in the field with very few choices. Are you saying that you've got two games and maybe a few others, and we've held already that they're both analogous to each other, and that you don't need an express statement indicating the motivation to combine two known games to make a better game? I'm not sure I understand your question, Your Honor. In other words, the mere existence of these similar games suggests their combinability. I agree with that, but we have a better case than that. We have the reference saying, hey, you can use this in a physical game or a computer game, and we have the prior panel of this court basically saying that there was a lot of evidence in the record showing that in strategy games, it mattered not to them whether it was physical or electronic. I suggest nothing could be clearer than that there was a motivation to combine these games. In fact, the Swift reference basically teaches, suggests using a physical game or a computer game, which, in my view, is the clearest form of motivation to combine. The district court didn't even mention motivation to combine in its consideration of… But that doesn't actually matter, right? Because we have to assume that the jury found the absence of a motivation to combine. It does not matter, but it is a background fact that you would think that when one of the key issues is motivation to combine, the court would have mentioned it. I'm not saying that is a game changer, to use a bad pun, but the fact is that there was a more fundamental problem, and that is that Intervention argued to the jury that both its expert and MGA's expert said there were no game pieces, which is what the asserted claims talk about, game pieces. But neither one said that, and this is a critical point. This was evidence before the jury that I think misled the jury, and it misled the district court judge. Let's assume that the record… We have to look at the record to determine whether a reasonable person, a reasonable jury could come out this way. Let's assume there's two pieces of evidence that point towards a motivation to combine, and there's two pieces of evidence that point against it, and our job is to decide could a reasonable person pick one or the other of those two alternatives. Do we subtract the two from two and get zero, or do we say it's a question of the weight of the evidence and the jury has the responsibility to weigh the… How do we deal with a record when there's conflicting evidence going in different directions? Your Honor, if you had the evidence in equipoise on one side versus the other side, then… I wasn't hypothesizing that case because I don't know what equipoise in that kind of a case would mean. But I'm saying if you did, if you did, if you had the scales that were even, which goes to Judge Durante's question, then you have a substantial evidence question. In this case, you don't have even scales. You have one, and the record will show my left hand is way up and my right hand is way down. But the jury picked your right hand, and the question now is could we consider that substantial evidence, even though your left hand was up in the air? Your Honor, my right hand was so low, below the podium, that I don't think there was substantial evidence. It wasn't actually. It was about desk height. I don't think there was substantial evidence on motivation. I think it was all on one side. No evidence at all on the other side. So little, Your Honor, as to be well below substantial. Can I ask a slightly different version of what I think is the same question, which we're focusing on? It's one thing to say, as we said in our last opinion, that once an inventor has defined his problem, or their problem, as creating a certain kind of laser game, the computer version is analogous art. But that comes in at stage two. Stage one is getting to the definition of the problem as a physical laser game. That's a different question, and one needs a motivation to define the problem that way. Did the other side have evidence that said an ordinary skilled artisan, and just accept for these purposes that we've got the right ordinary skilled artisan, the mechanical engineering person, would not have had a motivation in the world of games to pick out this laser chess article and this swift thing and say, let's do this combination when there are a million other games we could create? Your Honor, I don't think they had any substantial evidence. They focused on monopoly games. They said the field is a monopoly game, and that we're talking about different things. They're saying that you couldn't combine them, if I recall the testimony, because there were substantial challenges to convert a computer game to a physical game, and they mentioned the kinematic mount. You have to set the mirrors in a very precise and non-moving way in order for the reflections to work right. Put that aside. I'm focused on stage one. What evidence did they have that there would not have been a motivation to select these two things and combine them to define the problem as creating a real-world laser board game? Your Honor, as I recall their evidence, it was focused on their definition of the field of the invention, and moreover the problems involved, that suggest that when you've got a physical game and a computer game, the problems were so enormous to create the physical game, the things I mentioned, that one wouldn't think of combining a physical game with a computer game. The fallacy in that argument is that they were talking about the commercial product, because the claims say nothing about these critical elements. They say nothing about one-tenth of a degree of accuracy for the kinematic mount. They don't even define a kinematic mount. They don't use that language, but they do talk about the beveling, but they don't use that cam frame or whatever it is. Your Honor, they talk about beveling, and there are a couple of figures that show beveling, but claim 33, there are no claims that say beveling, including claim 33, on which they focus. Claim 33 says that you put a piece in a recess, but it doesn't say anything about beveling, and it doesn't say anything about one-tenth degree accuracy, which they said was critical not only to workability, but to the success of the invention in the marketplace. It says nothing about displacement errors. It says nothing about optical quality. All those things were absolutely critical. Why are you focusing only on claim 33? We have a jury verdict of infringement, do we not, of quite a number of claims of infringement? Yes. And you didn't make any distinction in your brief in saying a verdict must fall if we win only on claim 33 and even if the rest are good. That's true, Your Honor, but intervention is focusing on claim 33, so that's why I'm responding to claim 33. None of the claims talk about beveling. None of them talk about these critical aspects of a commercial product, which they said was necessary for commercial success, which they said was necessary for workability, which leads me to the point that, because of that, there's no nexus. There's no nexus between the secondary considerations that they argue are highly relevant and the claimed invention. Whatever claim you take, whether you take claim 33 or others, they argue claim 33, so I mention claim 33. Mr. Donahue, do you want to save some time for rebuttal? I do, Your Honor. We'll give you your full three minutes since you've got a lot of questions. Mr. Otteson. Thank you, Your Honor. I think fundamentally the court's questions have already shown that this is a borderline frivolous appeal. We have a situation. Questions don't show much of anything. Okay, well, I mean, I will say that I think it is a borderline frivolous appeal because substantial evidence does support every single underlying factual basis, underlying obviousness. So what is the evidence for drawing a line of the sort that I raised for consideration in discussion with Mr. Dunner between what we said, sensibly enough, in the first appeal about how somebody who had defined for himself a problem of creating a laser game would, of course, look at the computer articles and the physical board game and the motivation to combine question? Sure. Well, I think the line in terms of substantial evidence is it's some evidence that a reasonable jury could rely on. What is the evidence? So in this case, the evidence is, well, first of all, in terms of burden of proof, it's their burden of proof to show that by clear and convincing evidence. They didn't really show anything. You still haven't started talking about the evidence. Okay, I'll tell you what the evidence is. Dr. Imrel, my expert, testified at trial that one of ordinary skill in the art would not have combined the laser chess articles with SWIFT because there would have been substantial technical problems that would have prevented a successful result in achieving the 242 invention. And although this court did say that there's something in that, in terms of substantial technical challenges, is there something more than the alignment and fixity of the mirror? Well, that's the main thing. That is the main thing because if you look at the claims of the 242 patent and the disclosure, it talks a lot about how important it is to maintain optical alignment and how there are features. And, you know, I've got some blow-ups here. The specification and the figures talk in some detail about the features of the invention that are necessary to create a physical, real-world 3D game that can maintain optical alignment. And our expert testified, well, even though, you know, in terms of being reasonably pertinent in terms of game strategy, the laser chess articles are talking about a similar strategy game, they have absolutely nothing to do with solving problems like maintaining optical alignment in the physical world. So that's why one of ordinary skill in the art would not combine the laser chess articles with the SWIFT patent because the laser chess articles are, they're pixels on a screen, completely two-dimensional. Moreover, even the SWIFT patent doesn't teach anything about how to move physical pieces around the board, rotate them, move them from space to space during gameplay and maintain optical alignment. We had detailed testimony from Dr. Imel where he explained the technical challenges that you have, you know, you've got a child playing the game, somewhat careless about how they place their pieces, but the specification and the figures specifically show you've got these beveled edges both on the bases of the pieces and you can see also in the recesses on the game board that create this kinematic map. Do any of the claims at issue discuss beveling by word or otherwise? No, they do not. So if you take, for example, claims... I'm just trying to get a fix on your argument. It sounds to me like you're saying even though the claims don't define the solution to the precision and stability of alignment problem, neither do the laser chess articles, and in order for claims that don't claim the solution to work, they would have to have had some solution in the specification that enables it and therefore there wouldn't have been a sufficient motivation to combine. Right. There's an enabling disclosure in the specification, as I've been pointing to in my boards here. In addition, the claims do cover that type of a solution to maintain optical alignment. The claims talk about it. For example, claim 31 says, where in alternate turns are taken to move playing pieces for the purpose of deflecting laser beams so as to illuminate the key playing piece of the opponent. So we're talking about physical pieces that have to move around a physical board and basically land on a space each time and maintain alignment in a way that you can bounce a laser beam off four, six, eight, ten mirrors and still hit the target. There is nothing in either Swift or the laser chess articles that teach that, and again with laser chess, we're talking about something that although it may have been reasonably pertinent with respect to gameplay and strategy, taught absolutely nothing about how to solve that real world problem. Mr. Otteson, if we agree with you to uphold the jury verdict of non-obviousness, what about willfulness? Here are two references and they are related. Weren't there reasonable arguments? Are we hearing reasonable arguments to find that the invention was obvious and therefore infringement was not objectively willful? No, your honor, and I'll tell you why. As an initial matter, MGA didn't even attempt to formulate a legally sufficient obviousness defense until after they were joined by the district court and the case came to appeal to this court the first time. They didn't hire an expert to examine motivation combined. They didn't hire an expert to examine level of ordinary skill. Let me focus this a little bit. Under Seagate, there are two components. Both of them have to be satisfied. Assume, at least for the moment, that the second component is factual, call it subjective bad faith, and assume that the jury could easily find subjective bad faith because it could find a kind of reckless and irresponsible disregard for any patent rights. But sometimes reckless conduct turns out okay because it's actually objectively okay. So focus just on why their arguments don't establish an objective basis for an invalidity defense, even if they never thought about them at the time. Sure. They had a complete failure of proof on every single gram factor. They didn't submit any evidence of motivation to combine. In fact, what their experts said with respect to motivation to combine was, well, these are similar ways to teach the same concept. I mean, that's much worse than Dr. Yanko in the InTouch case where she said, well, I used the patent as a roadmap to put these puzzle pieces together. What she did was actually a lot more than what Mr. Phillips did in our case. So that's one thing. Motivation to combine, complete failure. Number two, level of ordinary skill in the art, complete failure. Mr. Phillips said that he applied the Ruiz factors, but he didn't do it. He admitted on cross-examination that he didn't really apply the Ruiz factors. He looked at the patent and he said, wow, in order to make something that cool that would maintain optical alignment, I'd have to get a mechanical engineer with three years of experience specifically in lasers and optics. What about the provisional rights issue? Why wasn't the amendment, which narrowed the scope of the claims in response to the rejection, a substantial change? Yes, Your Honor, that's an excellent question because with respect to Claim 39... Most questions from the bench are excellent. I think you've told me that before, Judge. Thank you. With respect to Claim 39, Claim 39 was already specifically found by the Patent Office to be patentable. So it was not amended to avoid a rejection based on SWIFT. And if you actually look, I can give you the sites and I think we addressed this in our brief, but the PTO confirmed the patentability of Claim 39 in the same office action where it said other claims were invalid based on SWIFT, or obviously based on SWIFT. So truly, the changes made to Claim 39 with respect to warning did not change the scope of the claim because the concept that the pieces in the claim and in the game were movable was already fully incorporated into Claim 39. So the... Was there a change of a transition term? There was a change in a transition term. They went from consisting up to comprising. That's a broadening change. Yes, that's a big change. It's a broadening change, but I think what that shows is they weren't trying to narrow the claim to avoid the prior art in any way. But the test, the identity test doesn't say why. Substantial identicality. I mean, why? If it's broadening, it's broadening for whatever reason. I mean, really, I think if you look, not just at Claim 39, but all of the claims, they're really in a similar situation where the claims are talking about movable pieces already because the claims talk about moving the pieces from space to space and rotating them to deflect a laser to hit the key piece. And so the concept of movable pieces is already incorporated. We're talking only, you've been talking only about Claim 39. Do you have an argument that broadening changes, even if made in Claim 39, were not made in some of the other claims? And so who cares about 39? Or do you not have that argument? Yes. With all of the claims. On the provisional, on this provisional rights. Right. With respect to provisional rights damages, all of the claims had the term movable inserted in various places to clarify that the pieces were movable. But that was something that was already really explicitly disclosed in the claims because the claims talked about the pieces moving around the board. So this was truly a clarifying change. Now here's what I'm trying to, let me see if I can state this more precisely. Let's assume for purposes of this question that there was a broadening change in Claim 39 that would make provisional rights damages as unavailable as to Claim 39. Okay. What then about provisional rights? Is that also true of Claim 31, 32, 33, 41, et cetera? There was a nominal rejection of other claims based on the SWIFT reference. That is true. And a change was made to those claims to add the term movable in front of some of the terms relating to... But your position is that those claims already included movable anyway, so even if the examiner thought there was a prior art problem before the change and then not after, the examiner was wrong about there being a difference between those two, a substantive difference. Right. There was not a substantive difference because movability was already incorporated into the claims. So it was a clarifying change. It didn't change the scope. So the claims were substantially identical. So if I could talk just a little bit more about willfulness. We have a situation where MGA utterly failed on every single factual issue for its obviousness defense. Motivation to combine, we've talked about quite a bit. Level of ordinary skill in the art, their expert just glossed over it. He didn't apply the Ruiz factors. My expert did in a lot of detail. With respect to differences between the prior art and the claims invention, there are, and I know Mr. Gunner disagrees with this, but there are many, many holes. There wasn't a prima facie case on a single claim. Can you name one or identify one or two claim elements that cannot be found in the combination of the two laser chest articles and SWIFT? Yes. Game piece, playing piece, which they essentially have the same construction. Game board spaces. Now the reason for that is it's also important to understand, and we as patent lawyers know, that when you do an invalidity analysis or an infringement analysis, you have to apply the court's claim construction. So what aspect of the construction of those terms distinguishes SWIFT, which is a board game with pieces? Right. So the definition of game piece, as construed by the district court and was never contested, and it's basically the same for playing piece, is a mirrored or non-mirrored structure that can be placed on the game board and moved by the players during the course of game play. Can be. Yeah, but that's what the claims talk about. Right, but the pieces in SWIFT, does can mean something physical or mean it's intended to be moved according to the rules of the game? Well, that's part of the claim construction, that they're moved according to the rules of the game. In SWIFT, it's a very different structure. First of all, it's a big table game that you'd find in an arcade or a bar. And when you play the game, you put these mirror assemblies into these X-shaped slots and you jam them in there and leave them. You do not move them during game play. Once you put them in, they're fixed. This game is completely different because you've got pieces that you move around the board and rotate, kids are playing this game, and you have to have a nice way for the pieces to seat into the recesses on the game board every time to maintain optical alignment. And I'll tell you what, this game works like a charm with respect to that. Now, the court's claim constructions, the district court's claim constructions, which are completely unchallenged, with respect to game board, it's a structure having a playing surface that can support game pieces. This game piece we talked about, it's a structure that is moved around the game board during game play. These are not present in either Swift or the Laser Chess Articles. They're just not there. So if you're going to apply the claim construction... I think you can see your red light. I apologize, Your Honor. And so we'll go to Mr. Donner for whatever rebuttal he has. Thank you very much. Will I get the extra time that... You have three minutes. Okay. Your Honor, just a few points. Your opponent had a little extra time. You have three minutes. Okay, Your Honor. First of all, on motivation, the fact is that Mr. Otteson focused on the technical problems, which is a point I made. But the Swift patent is loaded with details of how to get alignment. The Swift patent teaches you how to get alignment in a game. And so if you're combining those two references, you're going to be focusing on that alignment. Secondly, the point about differences between the prior and the claim dimensions, there are no differences in the combination. If you look at the Phillips claim chart, you'll see every limitation covered. The way they argued to the jury that there were differences was they said that there were no game pieces disclosed. But what they argued was, and the testimony of Phillips was, there were no physical game pieces. And there were no movable key pieces. There weren't any other differences between the combined references. As to Claim 39, it is quite clear that it was not done to clarify. There was no indefiniteness issue. There was no indefiniteness rejection. And in fact, Claim 39 was broad not only in comprising, but there was a reference to at least two mirrors and change to at least one mirror. There are very significant changes. This is Donner. You're running quickly out of time. I don't want to delay you. Would you speak to the expense of the willfulness finding? That was an expensive finding. Okay, I will speak to willfulness. One is, the arguments that we made looking at objectively, backwards, in terms of what evidence that we put in. We put in evidence about a difference in the person of ordinary skill in the arts. Imro, their expert, admitted, he admitted that a mechanical engineer would not be capable of making the invention, would not be in the field of making. He admitted it would be practicing the invention. And that is not the test. You look at a person of ordinary skill in the art in terms of what capability does he need to make an invention that's distinguished from practicing. That's one thing. No nexus in the secondary considerations because these critical elements were not in the claims and the commercial product was what they looked at. And Imro said, for it to work and to have commercial success, you need to have these critical limitations. These critical disclosures were not in the 242 patent. They talked about a, they talked about the kinematic mount, but they didn't tell you you need a 0.1 degree accuracy. They didn't tell you how to get optical alignment. They didn't tell you how to do all the things that he said were critical in the game. I suggest we had a load of evidence that not only was reasonable, but I think should have prevailed, but for the misleading of the jury by the expert witness who basically looked at the wrong game. You don't have an evidentiary objection before us? No, we do not. Okay. I mean, that is not an admission or misleading or anything. It's pure sufficiency of evidence either for weight of the evidence or JMOL purposes. Except that Judge Klager was talking about for me to direct my comments to willfulness. And I'm really trying to show that the positions that were taken were not only reasonable, but were the right positions on every front. And there was no willfulness case in this thing. Thank you, Mr. Donner. We will take the case under advisement. Thank you.